BOARD OF COUNTY COMMISSIONERS OF TAL-
BOT COUNTY ET AL. *v.* TROXELL, ET AL.

[No. 238, October Term, 1956.]

136

*Decided June 25, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Z. H. Stafford* for the County Commissioners and the Planning and Zoning Commission, appellants.

*Charles E. Wheeler* for the intervening defendants, appellants.

*John Clarence North* for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal in a zoning case is from a decree of the Circuit Court for Talbot County invalidating a resolution of the Board of County Commissioners which rezoned a tract of land of about 90 acres from "Waterfront" to "Suburban".

No question is raised as to the standing of the County Commissioners to appeal, and in any event the intervening developers joined in the appeal.

In 1951, Robert F. Austin and Herbert T. Austin purchased a tract of land or farm known as "Oaklands", located on a peninsula bounded on the east by the Easton-to-Oxford road, on the north by an estate known as "Cedar Point", on the west by LeGates Creek, and on the south by Peachblossom Creek. It contained about 240 acres, with about a mile of waterfront. There were two residences then located on the property, and the Austins in 1952 obtained approval, under an interim zoning ordinance then in effect, of a development plan comprising 28 lots, 20 of which ranged in size from 1½ acres to 2 acres, and 8 of which were larger than 2 acres, the average size being in excess of 2 acres. The lots laid out bounded on the two creeks, and the interior land or core of the peninsula was not subdivided. However, when the comprehensive zoning ordinance was passed in 1953, the whole tract, with the exception of a 500-foot strip along the road, was zoned "Waterfront", a classification wherein the minimum lot size is 2 acres.

In 1956, the Austins applied to the County Commissioners to rezone the interior land as "Suburban", a classification that permits lots of a minimum size of 10,000 square feet, or under certain conditions relative to water and sewerage, 7,500 square feet. At that time 18 lots had been sold and residences ranging in value from $29,000 to $81,000, had been erected on the original lots laid out. The application was approved by the Planning and Zoning Commission, and a public hearing was held. The County Commissioners based their resolution on a finding that the 90-acre tract had been improperly zoned "Waterfront" in the ordinance of May 16, 1953, "for the reason that the aforesaid ninety (90) acres are surrounded by other properties, to wit: 'Waverly' to the North, and the sub-division South of Peachblossom Bridge,

which were zoned 'Suburban' upon the passage of said Ordinance." However, the evidence shows that "Waverly" is located some distance from the tract in question, about 2 miles by water and 1.7 miles by road, separated from the tract in question by the "Cedar Point" estate. It consists of some 375 acres comprising woodland, farm and undeveloped areas, and 70 acres divided into 14 parcels on the Tred Avon River and Planters Cove. The westerly side of the tract abuts on a territory within the suburban jurisdiction of Easton, where suburban size lots are permitted. The other property referred to is located at its nearest point about half a mile from the tract in question, and beyond the Peach-blossom Bridge. A subdivision known as Gilnock Hall contains about 22 acres that had been laid out in small lots before zoning became effective, and two negro settlements containing small lots. The whole area contains about 740 acres, with a railroad track running through it. The fact that these two areas were zoned "Suburban" would not seem to be controlling, if relevant at all. Factors not present in the case of "Oaklands" may have been pertinent there. The Chancellor found that "Oaklands" was not comparable to the other two tracts at the time the ordinance was passed. Likewise, the fact that a 500-foot strip along the road was zoned "Farming" (the practical equivalent of "Suburban") is not significant, in the light of undisputed testimony that it was the uniform policy to so classify property along heavily travelled public roads. It was clearly brought out that there was an abundance of building sites available in suburban classifications, and no demonstrated need for a rezoning of the tract in question, although such action would enhance the value of the tract to the appellants.

It is conceded that there was no evidence at all of a change of condition in the instant case. Nor is it denied that as a legal proposition, the question presented is whether there were sufficient facts before the County Commissioners to support their finding that the original zoning was a mistake. *Wakefield v. Kraft,* 202 Md. 136; *American Oil Co v. Miller,* 204 Md. 32; *Offutt v. Bd. of Zoning Appeals,* 204 Md. 551; *Hardesty v. Zoning Board,* 211 Md. 172; *Mettee v. County*

*Com'rs,* 212 Md. 357. In these and many other cases we have stated the proposition that there is a presumption that the zones established by an original zoning ordinance were well planned and arranged and intended to be permanent. The burden of proof is upon the proponents of the change. The appellants argue that no particular study was made of the tract in question and that its original zoning was "perfunctory". We think, however, that the evidence shows no more than a change of mind on the part of the Planning Commission and County Commissioners. It was shown that a careful study was made at that time, and that at the public hearing on the original zoning a considerable group of nearby residents had urged that the minimum lot size should be fixed at 5 acres instead of 2. The appellants attended this meeting but made no protest against the action taken.

All of the witnesses seemed to agree that the eventual development of the tract in question into lots of a size permitted in the "Suburban" classification would depreciate the value of properties in the immediate neighborhood. The appellants say they intend to develop the property according to a plan produced, calling for lots of a 1-acre size. Some of the experts agreed that this would not be detrimental. But there is no such intermediate classification, and it seems to be conceded that no conditions could be attached to the rezoning. Cf. *Wakefield v. Kraft, supra.* The primary reason for the larger lots laid out, was because otherwise the developer could not have obtained approval from the Health Department. We have indicated in several cases that reclassifications or special exceptions representing a departure from the comprehensive plan should not be made on a piecemeal basis, but as the result of a general resurvey. Cf. *Zinn v. Board of Zoning Appeals,* 207 Md. 355, and *American Oil Co. v. Miller, supra.* There also seems to be little dispute in the case that due to the character of the soil, sewerage effluents could not be properly disposed of if the property were fully built on to the limit permitted by the rezoning. This would present a serious menace to health and cause pollution in the waters of the two creeks. The evidence on this point is clear and certainly furnishes no support for the action taken.

Under all the circumstances, we agree with the Chancellor's conclusion that the evidence produced does not support the contention that there was an original mistake.

*Decree affirmed, with costs.*